IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § | |
| Plaintiff, § § | |
| v.  § | CAUSE NO. EP-24-CV-27-KC |
| § | |
| JESUS RODRIGUEZ, § § § | |
| Defendant. § | |

## ORDER

On this day, the Court considered Plaintiff Securities and Exchange Commission's ("SEC") Motion for Default Judgment ("Motion"), ECF No. 11. For the reasons set forth below, the Motion is **GRANTED** in part.

**I.      BACKGROUND**

This is a civil enforcement action, in which the SEC alleges that Defendant Jesus Rodriguez misappropriated $3.4 million from ten people between March 2014 and July 2021. Compl. ¶¶ 1, 16, ECF No. 1. The following facts are derived from the Complaint and are taken as true for purposes of adjudicating the Motion. *See Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015) (citation omitted).

**A.      Factual Allegations**

Rodriguez worked as a registered representative and investment adviser representative at the El Paso, Texas branch of "a large financial institution" identified only as "Firm A." Compl. ¶¶ 1, 12. In this capacity, he recruited clients who opened brokerage and advisory accounts with Firm A. *Id.* ¶ 14. At least ten of those clients—identified only as "Investors A–J"—became the victims of Rodriguez's alleged misappropriation of funds. *Id.* ¶ 16. For most of the Investors,

Rodriguez acted only as their registered representative. *Id.* ¶ 14. But for Investors D, E, and H, Rodriguez also acted as their investment adviser, and thus owed them a "fiduciary duty of utmost good faith." *Id.* ¶¶ 50–55.

Rodriguez misappropriated the Investors' money through three methods: (1) unauthorized wire transfers, (2) unauthorized cash journal transfers, and (3) unauthorized ACH transfers. *Id.* ¶ 20. First, he initiated more than seventy unauthorized wire transfers between March 2014 and July 2021, moving a total of $1.7 million out of the accounts of Investors A, C, D, E, G, and I, for his own benefit. *Id.* ¶ 21. In nearly all of these cases, Rodriguez wrote on Firm A's internal authorization form that he had received a verbal request for the wire transfer from the Investor, when actually, he had not. *Id.* ¶ 22. On the forms, he specified fake reasons for the wire transfers, including, among others, "equipment for business purchase" and "property taxes." *Id.* In one instance in December 2018, the amount of the wire transfer—$125,000—exceeded Firm A's limit for verbal authorizations. *Id.* ¶¶ 27–28. Therefore, in that case, Rodriguez drafted a written authorization letter, applied an image of Investor C's signature to it, created an email account, and, posing as Investor C, sent the forged authorization letter to his own email account at Firm A. *Id.* ¶¶ 27–29.

Second, Rodriguez made "dozens" of unauthorized cash journal transfers, which permitted him to transfer funds internally, from eight of the Investors' accounts to other accounts at Firm A. *See id.* ¶ 30. In total, between March 2016 and June 2021, Rodriguez misappropriated $1.3 million in this manner. *Id.* As with the unauthorized wire transfers, Rodriguez accomplished the unauthorized journal transfers by completing forms that represented that he had received verbal instructions from the Investors to perform them. *Id.* ¶ 31. And again, he specified false reasons for the transfers. *Id.* ¶ 32.

Third, between November 2018 and July 2021, Rodriguez misappropriated $400,000 from six of the Investors' accounts by conducting over 100 ACH transfers without permission. *Id.* ¶ 37. In so doing, Rodriguez "took advantage of policies at Firm A that did not require an authorization from the Firm A account holder for ACH transfers initiated by third-party financial institutions, such as credit card companies." *Id.* ¶ 40.

Regardless of method, Rodriguez transferred the funds for his own benefit. For many of the wire transfers, he had the money sent to his mother's bank account, after which he or she paid Rodriguez's credit card bills and car payments, withdrew cash from ATMs, and transferred funds to Rodriguez's own bank account. *Id.* ¶ 25. For other wire transfers, the money was sent to Rodriguez's then-wife's bank account or to the account of her company. *Id.* ¶ 26. In one instance, a $125,000 wire transfer was made for Rodriguez's purchase of a Lamborghini vehicle. *Id.* ¶ 28. For the cash journal transfers, Rodriguez similarly transferred money from the Investors' accounts to Firm A accounts owned by his relatives and associates, including his mother. *Id.* ¶¶ 34–36. And for the ACH transfers, Rodriguez either transferred the money directly to one of over a dozen different credit card companies to pay off his own credit card balances, or to an online payment application, from which he later withdrew the funds to his own account. *Id.* ¶¶ 38, 41. Rodriguez used the misappropriated funds "to support his opulent lifestyle," which included the purchase of several automobiles, "including a Lamborghini, multiple BMWs, a Land Cruiser, a Land Rover, and a Toyota Yaris." *Id.* ¶ 68. Rodriguez regularly traveled from El Paso to Austin, Texas to race his cars on a private racetrack. *Id.*

All told, Rodriguez misappropriated approximately $3,475,000 from the Investors: $675,000 from Investor A, $600,000 from Investor B, $520,000 from Investor C, $440,000 from Investor D, $380,000 from Investor E, $335,000 from Investor F, $295,000 from Investor G,

$124,000 from Investor H, $123,000 from Investor I, and $28,000 from Investor J.  *Id.* ¶ 16.  Only a small portion of the unauthorized transfers that led to these misappropriations were funded by selling some of the securities in the Investors' brokerage accounts.  Such sale-funded transfers represent all of the transfers from Investor F's account, $84,000 of the transfers from Investor E's account, $20,000 of the transfers from Investor G's account, and $12,000 of the transfers from Investor D's account.  *Id.* ¶¶ 47–49.  Otherwise, Rodriguez withdrew borrowed funds secured by pledges of the securities in the Investors' brokerage accounts.  *Id.* ¶¶ 43–46.

Rodriguez took steps to conceal his misappropriation from the Investors.  Many of the Investors relied on Rodriguez to inform them about the status of their accounts, because they were unable to understand Firm A's English-language account statements, or because they simply did not review them regularly.  *Id.* ¶ 19.  Rodriguez persuaded Investors D, E, and H to have their account statements sent to Rodriguez, directly.  *Id.* ¶¶ 18, 57–58.

Despite these efforts, some of the Investors began to raise concerns with Rodriguez.  For example, on October 18, 2018, Rodriguez effected an unauthorized wire transfer of $25,000 out of Investor E's account to a company partly owned by Rodriguez.  *Id.* ¶ 59.  Although Investor E's account statements were routed to Rodriguez, Firm A sent an email notification to Investor E, informing her that her wire transfer request had been processed.  *Id.* ¶ 60.  Investor E was confused when she received this message, because she had not, in fact, initiated any wire transfer request.  *Id.*  She asked Rodriguez about the email, to which he responded that he would "take care of it."  *Id.*  Investor E made repeated requests for copies of her Firm A account statements, but Rodriguez "made excuses" and failed to provide them.  *Id.* ¶ 61.  In another instance, Investor J noticed that money had been withdrawn from her account and asked Rodriguez about

it.  *Id.* ¶ 63.  Rodriguez told her that it was caused by "an error," and moved $16,460 into Investor J's account to partially repay her.  *Id.*

Firm A staff also began to make inquiries with Rodriguez regarding the large debts that Rodriguez had incurred against some of the Investors' securities.  *Id.* ¶ 64.  Rodriguez offered false explanations to justify the loan balances, representing, for example, that one investor "had 'borrowed funds to acquire commercial real estate,' and that Rodriguez was 'comfortable with the client's capacity and ability to pay the loan off.'"  *Id.* ¶ 65.  Rodriguez made similar misrepresentations to justify large loan balances for at least two Investors, in response to multiple inquiries from Firm A's "leverage review personnel" over the course of more than two years.  *Id.* ¶¶ 65–67.  Eventually, in 2021, Firm A discovered Rodriguez's misconduct and terminated his employment.  *Id.* ¶ 12.

      **B.**      **History of Civil and Criminal Proceedings Against Rodriguez**

On December 20, 2023, Rodriguez was indicted on wire fraud, identity theft, and other criminal charges stemming from the conduct at issue in this case.  *See generally* Indictment, *United States v. Rodriguez*, No. 3:23-cr-2507-KC (W.D. Tex. Dec. 20, 2023), ECF No. 3.  Rodriguez was arrested on January 12, 2024.  Arrest Warrant Executed, *United States v. Rodriguez*, No. 3:23-cr-2507-KC (W.D. Tex. Jan. 16, 2024), ECF No. 9.  The SEC initiated this civil enforcement action just over a week later, on January 24.  *See generally* Compl.  The SEC brings two civil claims against Rodriguez: (1) for violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the related Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) for violating Section 206 of the Advisers Act, 15 U.S.C. § 80b-6(1)–(2).  Compl. ¶¶ 71–77.

Rodriguez was detained without bond in the criminal proceeding.[1]  Order Granting Mot. Detain Def. Without Bond, *United States v. Rodriguez*, No. 3:23-cr-2507-KC (W.D. Tex. Jan. 19, 2024), ECF No. 18.  Rodriguez was thus personally served with process in this case at the West Texas Detention Facility in Sierra Blanca, Texas, on February 8, 2024.  Summons Returned Executed, ECF No. 5.  Rodriguez's deadline to answer or otherwise respond to the Complaint elapsed, and he did not do so.  The Clerk entered default following the SEC's motion.  Clerk's Entry Default, ECF No. 9.

After Rodriguez told the SEC he was "close to finalizing his engagement of an attorney in El Paso and that he intends on defending this action," the parties jointly moved for an extension of the SEC's deadline to move for default judgment, to allow Rodriguez further opportunity to retain counsel and respond to the Complaint.  Mot. Extension 2, ECF No. 10.  The Court granted the request, extending the SEC's deadline to move for default judgment to May 15, 2024.  Apr. 11, 2024, Text Order.  That deadline elapsed, without any further appearance by Rodriguez.  On May 15, the SEC filed this Motion for Default Judgment, together with a Memorandum in Support ("Memorandum"), ECF No. 12.  Rodriguez has not responded to the Motion.

Meanwhile, in the criminal case, the Court accepted Rodriguez's guilty plea.  Order Accepting Plea, *United States v. Rodriguez*, No. 3:23-cr-2507-KC (W.D. Tex. Nov. 6, 2024), ECF No. 66.  He is set for sentencing on March 27, 2025. Order Resetting Sentencing, *United States v. Rodriguez*, No. 3:23-cr-2507-KC (W.D. Tex. Dec. 19, 2024), ECF No. 72.

---

[1] As of the date of this Order, Rodriguez remains in federal pretrial custody.

## II.     DISCUSSION

### A.     Standard

The clerk of the court shall enter default when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). After the clerk enters default, a party may move for a default judgment. *See* Fed. R. Civ. P. 55(b); *see also N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996).

Courts conduct a three-step analysis to determine whether default judgment should be entered. *See CoreStates Constr. Servs., Inc. v. Red Beard Excavators, LLC*, No. 1:22-cv-898-RP, 2024 WL 1595696, at *2 (W.D. Tex. Feb. 29, 2024) (citations omitted); *Alvarado Martinez v. Eltman L., P.C.*, 444 F. Supp. 3d 748, 752 (N.D. Tex. 2020) (citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998)). First, the court determines whether entry of default judgment is procedurally warranted. *Alvarado*, 444 F. Supp. 3d at 752 (citing *Lindsey*, 161 F.3d at 893). Second, the court assesses whether judgment is substantively warranted—that is, "whether there is a sufficient basis in the pleadings for judgment." *Id.* (citing *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). In assessing whether the complaint contains a sufficient basis for a default judgment, the court applies the standard governing the sufficiency of a complaint under Federal Rule of Civil Procedure 8. *See Wooten*, 788 F.3d at 498. Rule 8 requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). And third, the court decides what relief the plaintiff should receive, if any. *Alvarado*, 444 F. Supp. 3d at 752 (citing *Ins. Co. of the W. v. H & G Contractors, Inc.*, No. 10-cv-390, 2011 WL 4738197, at *4 (S.D. Tex. Oct. 5, 2011)).

B.     Analysis

The SEC argues that entry of default judgment is procedurally and substantively warranted against Rodriguez on both its Exchange Act and Advisers Act claims. Mem. 1, 11–12. The SEC also argues that it is entitled to an injunction, permanently restraining Rodriguez from violating these laws in the future. *Id.* at 1, 19–20. However, the SEC asks "that the Court defer the determination of disgorgement and a civil penalty until after the parallel criminal action is concluded." *Id.* at 1.

1.     **Default Judgment is procedurally warranted.**

Courts consider six factors to determine whether the entry of default judgment is procedurally warranted. *See J & J Sports Prods., Inc. v. Morelia Mexican Rest., Inc.*, 126 F. Supp. 3d 809, 814 (N.D. Tex. 2015) (citing *Lindsey*, 161 F.3d at 893). These factors include: 1) whether there are material issues of fact at issue; 2) whether there has been substantial prejudice; 3) whether the grounds for default are clearly established; 4) whether the default was caused by good faith mistake or excusable neglect; 5) the harshness of default judgment; 6) whether the court would think itself obliged to set aside the default on the defendant's motion. *Lindsey*, 161 F.3d at 893.

Each of these six factors support default judgment in this instance. First, Rodriguez did not file any responsive pleading, so no material facts are in dispute. Second, Rodriguez's failure to appear in this matter has caused substantial prejudice to the SEC's ability to prosecute its case and "bring[s] the adversary process to a halt." *See H & G Contractors, Inc.*, 2011 WL 4738197, at *3 (citations omitted). Third, the grounds for default are clearly established because although Rodriguez indicated that he intended to do so, he never substantively responded to the allegations in the Complaint at any stage of this litigation. *A.P. Moller - Maersk A/S v.*

*Safewater Lines (I) Pvt., Ltd.*, 784 F. App'x 221, 228 (5th Cir. 2019).  Grounds for default judgment are established when a party is "totally unresponsive," even if they have previously appeared or—as in this case—indicated an intent to appear.  *See Flying R Aviation, LLC v. Bondio, LLC*, No. 22-cv-1341, 2023 WL 4826217, at *1–3 (N.D. Tex. July 26, 2023) (granting default judgment for plaintiff against defendant who had previously removed case to federal court and filed an answer but then subsequently "stopped participating" in the case) (citing *J.D. Holdings, LLC v. BD Ventures, LLC*, 766 F. Supp. 2d 109, 113 (D.D.C. 2011)).  Fourth, there is no evidence to suggest that Rodriguez's silence is due to "good faith mistake or excusable neglect."  *Lindsey*, 161 F.3d at 893.  Fifth, default judgment is not overly harsh given that the SEC seeks only the relief to which it is entitled under the applicable statutes and Rodriguez has failed to appear.  *See Holladay v. OTA Training, LLC*, No. 14-cv-519, 2015 WL 5916440, at *2 (N.D. Tex. Oct. 8, 2015) ("Plaintiff only seeks the relief to which she is entitled under the FLSA, mitigating the harshness of a default judgment against Defendants."); *Alvarado*, 444 F. Supp. 3d at 753 (reasoning that defendant's "complete failure to respond mitigates the harshness of a default judgment" (cleaned up)).  Finally, no facts or evidence suggest that Rodriguez would be able to demonstrate the good cause necessary for the Court to set aside default judgment.[2]  *See Holladay*, 2015 WL 5916440, at *2.

Thus, default judgment is procedurally warranted.

### 2. The SEC's pleading provides a sufficient basis for entry of default judgment as to liability.

As to the merits, the SEC argues that it is entitled to default judgment on both its Advisers Act and Exchange Act claims.  Mem. 13–19.

---

[2] However, this is not to predetermine any such request.  Rodriguez may file a motion to set aside default and vacate default judgment, and the Court will consider it in the ordinary course.

### a. Exchange Act

"Section 10(b) of the Exchange Act makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018) (omission and first alteration in original) (quoting 15 U.S.C. § 78j(b)). Pursuant to this grant of authority, the SEC promulgated Rule 10b-5. *Id.* "The scope of liability under Section 10(b) and Rule 10b-5 is the same." *Id.* at 206 n.4 (citing *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002)). For the SEC,[3] establishing liability requires proof of three elements: "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *Id.* at 206 (quoting *SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008)).

As to the first element, the SEC argues that Rodriguez made materially misleading omissions by failing to tell the Investors that he was making unauthorized transfers out of their brokerage accounts; and that he made material misrepresentations when he lied to the Investors and Firm A employees that questioned him about the unauthorized transfers. Mem. 14–15. A misrepresentation or omission is material when "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) (quoting *R&W Tech. Servs. Ltd. v. CFTC,* 205 F.3d 165, 169 (5th Cir.)). Many courts have held that misappropriating

---

[3] Unlike the SEC, private plaintiffs must also prove reliance and causation in order to recover damages in a private enforcement action under Section 10(b). *See SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012) (first citing *SEC v. Rana Rsch., Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993); and then citing *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985)); *SEC v. N. Am. Rsch. & Dev. Corp.*, 424 F.2d 63, 84 (2d Cir. 1970).

funds from an investor for undisclosed personal purposes necessarily entails a material omission. *See, e.g.*, *SEC v. Greenview Inv. Partners*, No. 18-cv-2349, 2020 WL 973750, at *2 (N.D. Tex. Jan. 2, 2020); *SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (collecting cases).  The Court finds these decisions persuasive.  Simply put, a reasonable investor would consider it important to know whether his banker is stealing his money.  *See SEC v. Chiase*, No. 10-cv-5110, 2011 WL 6176209, at *4 (D.N.J. Dec. 12, 2011) ("[A]ny investor would obviously want to know that his financial adviser was misappropriating the investor's funds.").  Rodriguez's failure to tell the Investors that he was misappropriating their money was thus a material omission, and his lies about whether he had made unauthorized transfers were material misrepresentations.

Second, the SEC argues that these omissions and misrepresentations were made in connection with the sale of securities in two ways.  One, because "Rodriguez funded some of his misappropriation by 'directly effecting securities sales in [the Investors'] accounts to generate cash and misappropriating all or a portion of the proceeds within three days.'"  Mem. 16 (quoting Compl. ¶ 37).  And two, because Rodriguez funded the rest of his misappropriation with borrowed money that was secured by the Investors' securities.  Mem. 17.  Deceptive acts are made in connection with the sale of securities when they are "more than tangentially related" thereto.  *Roland v. Green*, 675 F.3d 503, 520 (5th Cir. 2012) (citing *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 (2006)).  This element is satisfied where the defendant sells securities "while secretly intending . . . to keep the proceeds."  *SEC v. Zandford*, 535 U.S. 813, 824 (2002).  And "[o]btaining a loan secured by a pledge of shares of stock" is, for present purposes, the same as a sale of that stock.  *Rubin v. U.S.*, 449 U.S. 424, 429–30 (1981) ("Although pledges transfer less than absolute title, the interest thus transferred nonetheless is an 'interest in a security' . . . . [and] [i]t is not essential under the terms of the Act that full title pass to a transferee . . . ."

(citations omitted)).  Thus, by alleging that Rodriguez sold the Investors' securities and borrowed money against their securities to fund his misappropriations, the SEC has adequately alleged the second element of their Section 10(b) claim.

Third, the SEC argues that Rodriguez "had a high degree of scienter."  Mem. 18.  To be liable, the defendant must have acted intentionally or with severe recklessness.  *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).  Scienter can be established with circumstantial evidence.  *United States v. Ruggiero*, 56 F.3d 647, 655 (5th Cir. 1995); *SEC v. Fox*, 855 F.2d 247, 253 (5th Cir. 1988).  In sum, the SEC's allegations are that Rodriguez stole $3.4 million of his clients' money, which he used to pay off his credit card bills, buy luxury automobiles, and enrich his relatives, including his wife and his mother.  He made extensive efforts to conceal his theft, including by redirecting clients' account statements to his own address, falsifying Firm A's internal paperwork, creating a fake email address for one Investor, and lying to Investors and Firm A employees when they questioned his conduct.  It is not difficult to plausibly infer intent when a securities professional "pocketed" millions of dollars from his clients.  *See SEC v. Farmer*, No. 14-cv-2345, 2015 WL 5838867, at *11 (S.D. Tex. Oct. 7, 2015).  The "indications of an attempted cover-up" only make this inference stronger.  *See Kabani & Co. v. SEC*, 733 F. App'x 918, 918 (9th Cir. 2018).

Because it has plausibly established all three elements, the SEC has adequately alleged that Rodriguez is liable under Section 10(b) of the Exchange Act and Rule 10b-5.  The Motion is thus granted, and default judgment is entered against Rodriguez on that claim.

### b. Advisers Act

Most elements of a claim under Section 206 of the Advisers Act are established whenever there is a violation of Section 10(b) of the Exchange Act.  *SEC v. Jaitley*, No. 1:21-cv-832-DAE,

2024 WL 36011, at *4 (W.D. Tex. Jan. 3, 2024) (citing *Dembski v. SEC*, 726 F. App'x 841, 844 (2d Cir. 2018)). "[T]he only additional element that needs be proved is that the defendant's conduct occurred while the defendant was acting as an investment adviser for a client." *Id.* (citing *Dembski*, 726 F. App'x at 844). In other words, "[f]acts supporting . . . an Exchange Act Section 10(b) violation by an investment adviser will also support a showing of a Section 206 violation under the Advisers Act." *Id.* (quoting *Dembski*, 726 F. App'x at 844).

The SEC alleges that Rodriguez was acting as an investment adviser for Investors D, E, and H, for at least part of the time that he misappropriated money from their accounts. Compl. ¶¶ 50–55. Accordingly, the SEC has adequately alleged that Rodriguez is liable under Section 206 of the Advisers Act. The Motion is granted, and default judgment is entered against Rodriguez on that claim, as well.

### 3. The Court defers a decision on the scope of relief until after sentencing in the criminal case.

Finally, the SEC requests that the Court enter a permanent injunction, restraining Rodriguez from any future violations of securities laws. Mem. 19. The SEC submits no evidence, resting on the allegations in the Complaint. *See generally* Mem. The SEC also requests that the Court defer adjudication of its entitlement to any monetary relief until the conclusion of the parallel criminal proceedings. Mem. 1.

Although a plaintiff's pleading can provide a sufficient basis for a court to enter default judgment as to liability, this is ordinarily not the case for damages. *See United State ex rel. M-CO Const., Inc. v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987); *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979). Instead, damages must generally be proven by the submission of evidence, such as an affidavit, or through an evidentiary hearing. *See Freeman*, 605 F.2d at 857.

Similarly, courts do not ordinarily enter permanent injunctions on the basis of allegations alone—that is, without at least some evidence. *See, e.g.*, *Evans v. Does 1–877*, No. 1:23-cv-722-DII, 2024 WL 3843790, at *5 (W.D. Tex. July 11, 2024), *adopted*, 2024 WL 4377405 (Oct. 2, 2024). After entering default judgment as to liability on the basis of the pleadings, courts have deferred the question of whether to enter permanent injunctions until after the submission of evidence in support of damages. *See, e.g.*, *SPFM, L.P. v. Felix*, No. 5:16-cv-179-XR, 2016 WL 5854286, at *6 (W.D. Tex. Oct. 5, 2016) (citing *Sculpt Inc. v. Sculpt N.Y., LLC*, No. 14-cv-3398, 2015 WL 6690224 (S.D. Tex. Nov. 3, 2015)).

The Court finds this approach persuasive and follows it here. The Court also finds it appropriate to defer the determination of relief until after Rodriguez's March 27, 2025, sentencing in the parallel criminal proceedings. Thereafter, the SEC may file a new motion, requesting all relief—by way of an injunction, civil penalties, or otherwise—to which it believes it is entitled in this matter. The SEC is cautioned that, to support its request for relief, it must either provide evidence or a brief explaining why evidence is unnecessary in this context.

### III.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion, ECF No. 11, is **GRANTED** in part.

**IT IS FURTHER ORDERED** that **DEFAULT JUDGMENT** as to liability for violations of: (1) Section 10(b) of the Exchange Act and Rule 10b-5, and (2) Section 206 of the Advisers Act is **ENTERED** in favor of Plaintiff Securities and Exchange Commission and against Defendant Jesus Rodriguez.

**IT IS FURTHER ORDERED** that the SEC shall **FILE** a motion, on or before **April 17, 2025**, requesting all relief to which it believes it is entitled in this matter.

**SO ORDERED.**

SIGNED this 3rd day of January, 2025.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE